UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

MARCUS D. MIDDLEBROOK, #351947,                   Case No. 2:21-cv-208

               Plaintiff,                                   Hon. Paul L. Maloney
                                               U.S. District Judge

   v.

KELLY M. WELLMAN and
PATRICIA M. LEWIS,

               Defendants.
_____/

## REPORT AND RECOMMENDATION

### I.    Introduction

This Report and Recommendation (R&R) addresses the motions for summary judgment filed by Defendants Wellman (ECF No. 57) and Lewis (ECF No. 58).

Plaintiff—state prisoner Marcus D. Middlebrook—filed suit pursuant to 28 U.S.C. § 1983 on September 23, 2021. In his verified complaint, Middlebrook asserted that while he was confined at the Baraga Correctional Facility (AMF) in Baraga, Michigan, Dietician Kelly M. Wellman and Nurse Practitioner (NP) Patricia M. Lewis were deliberately indifferent to his serious medical needs when they refused to alter his religious diet to accommodate his soy intolerance. (ECF No. 1, PageID.3-12.) In addition to violating his Eighth Amendment rights, Middlebrook says the failure to accommodate his intolerance violated the Religious Land Use and Institutionalized Persons Act, as Middlebrook was forced to choose between abandoning his religious meal and being ill. (*Id.*, PageID.9-12.) Middlebrook sues Defendants in their

individual and official capacities for prospective relief and monetary damages.  (*Id.*, PageID.3,14.)

Defendants Wellman and Lewis now move for summary judgment.  (ECF Nos. 57, 58.)  Dietician Wellman argues that she is entitled to summary judgment because she has met the Rule 56 standard.  More specifically, Wellman says Middlebrook cannot establish that he had a serious medical need in the form of a soy allergy, or that she was deliberately indifferent to that need.  (ECF No. 59, PageID.301-302.) Furthermore, Wellman asserts that the vegan religious diet did not burden Middlebrook's sincerely held religious beliefs.  (*Id.*)  NP Lewis similarly argues that she is entitled to summary judgment because she has met the Rule 56 standard.  For her part, Lewis asserts that Middlebrook cannot establish that he had a sufficiently serious medical need, and that even if he could, Lewis provided Middlebrook with adequate medical care.  (ECF No. 58, PageID.231-235.)  Lewis also contends that she had no personal involvement with Middlebrook's religious diet.  (*Id.*)

Middlebrook responded to both motions, asserting: (1) that there are genuine issues of material fact, (2) that his stomach pain, vomiting, and diarrhea related to consuming soy, which persisted for several months, was a sufficiently serious medical need, (3) that Defendants were deliberately indifferent in failing to administer a soy allergy test or alter his religious meal during the relevant time frame, and (4) that forcing Middlebrook to choose between becoming ill and abandoning his religious meal substantially burdened his religious beliefs.  (ECF No. 66, PageID.840-847; ECF No. 67, PageID.853-861.)

The undersigned respectfully recommends that the Court grant Defendants' motions for summary judgment. Defendants have shown that there are no genuine issues of material fact, that Middlebrook did not have a sufficiently serious medical need, and that Defendants did not act with deliberate indifference to Middlebrook's needs. Additionally, Defendants have shown that the vegan religious diet did not burden Middlebrook's sincere religious beliefs. In sum, Defendants have met the Rule 56 standard with respect to Middlebrook's deliberate indifference and RLUIPA claims.

## II.    Factual Allegations

The heart of Middlebrook's allegations is that when he declared Judaism as his religion and began eating soy in April of 2019, he also began experiencing "dizziness, cramps, headaches, nausea, diarrhea, and a loss of appetite." (ECF No. 1, PageID.4.) Despite his complaints to health care and to the dietician regarding his symptoms, and despite his belief that he suffered from a soy allergy, he was never administered an allergy test. (*Id.*, PageID.5-7.) Based on his self-diagnosed soy allergy, Middlebrook believed that his options were to continue eating the vegan meals and suffer illness or abandon his religious tenets. (*Id.*, PageID.11.)

More specifically, Middlebrook alleges that he requested to be placed on a kosher diet on April 3, 2019. (*Id.*, PageID.4.) While undergoing the MDOC's approval process for a religious diet, Middlebrook requested, and was granted, a vegetarian diet. But when Middlebrook started the vegetarian diet, he began suffering from

"serious medical problems" including "dizziness, cramps, headaches, nausea, diarrhea, and a loss of appetite." (*Id.*)

Middlebrook says that on April 16, 2019, he submitted a kite[1] to health care, asking them about the effects of eating soy and expressing his belief that soy was causing him to endure serious medical problems. Middlebrook says that health care never saw him in response to this kite. (*Id.*)

Middlebrook kited health care again on August 11, 2019, asking about his diet. Middlebrook reports that by this time, soy products were the "main course" five days a week. He says that the soy was causing him to lose weight, and that he could not eat. In fact, Middlebrook says that he had not eaten since April 16, 2019. (*Id.*)

Middlebrook says that he next submitted a kite to the Chaplain about his problems with soy. The Chaplain recommended that he request an alternative diet from the Deputy Director's office. (*Id.*) On August 16, 2019, Middlebrook sent a kite to Defendants Wellman and Lewis about his problems with soy. Middlebrook says that he never received a response. (*Id.*, PageID.5.)

On August 23, 2019, Middlebrook sent a second kite to Defendants Wellman and Lewis regarding his diet. This time, he received a response, which stated that Middlebrook was scheduled to see a doctor. (*Id.*) The same date, Middlebrook was seen by a nurse in health services. The nurse allegedly informed Middlebrook that Defendants Wellman and Lewis had "every right to intervene" on the matter of Middlebrook's inability to consume soy. (*Id.*)

---

[1]    A "kite" is a written communication from an inmate to prison staff.

On August 9, 2019, Middlebrook says that he submitted a request to the Deputy Director's office as recommended by the Chaplain.  On September 4, 2019, Middlebrook received correspondence from Defendant Lewis indicating that diet modifications "are not made to accommodate individual food tolerances" and that the religious dietary menu would not be altered to accommodate Middlebrook's soy intolerance.  (*Id.*)

Middlebrook says that the next day, September 5, 2019, he was seen by an NP in health services.  The NP provided Middlebrook with antacids and recommended that Middlebrook continue to eat the soy in his food trays.  Middlebrook says that he tried, but his body continued to reject the soy.  (*Id.*)  On September 6, 2019, Middlebrook was again informed that the religious menu would not be altered to accommodate an individual's food intolerance.  (*Id.*, PageID.6.)

On September 10, 2019, Middlebrook submitted another kite to health care, informing health care that the antacids were not helping.  Middlebrook says that his continued illness caused him to abandon his religious beliefs with respect to his diet.  (*Id.*)  Also on September 10, 2019, Middlebrook says that he filed a grievance against Defendants for their refusal to accommodate his soy intolerance.  (*Id.*)

According to Middlebrook, the health care providers who reviewed his grievances refused to interview him and reiterated that "[h]ealth care does not order dietary modification to accommodate food preferences."  (*Id.*)  On October 19, 2019, Middlebrook kited Defendants again, asking why there was not a meat substitute for the religious/vegan menu.  (*Id.*, PageID.7.)  Middlebrook reported that he had been

starving himself and noted that MDOC policy provided that "[a] Bureau of Healthcare Services Dietician shall modify the vegan menu as necessary to provide for medical diets as ordered by the designated medical authority in facilities which have been approved for the service of therapeutic diets." (*Id.*)

Dietician Wellman responded to Middlebrook's kite, explaining that religious diets are not modified for individual food tolerances. Instead, for prisoners to receive modified religious diets, they must be approved for both a therapeutic (medical) diet and a religious diet; Middlebrook had not been approved for a therapeutic diet. (*Id.*) Middlebrook points to this response as proof that Defendants could have modified his diet.

### III.    Medical Records

Middlebrook's pertinent medical records show that on April 16, 2019, Middlebrook submitted a health care kite noting that he was experiencing "dizziness, cramps, headache, nausea, diarrhea, weakness and loss of appetite" since he "started back eating soy." (ECF No. 59-9, PageID.523.) Middlebrook met with a registered nurse the next day.[2] The nurse noted that Middlebrook was not distressed during the visit, was not nauseous or vomiting, and was not experiencing abdominal pain or discomfort. (*Id.*, PageID.526-527.) The nurse told Middlebrook to increase his fluid intake and submit another kite if his symptoms persisted or worsened. (*Id.*,

---

[2]    Middlebrook claims that this appointment never occurred. (ECF No. 1, PageID.4.)

6

PageID.526.)  During this appointment, Middlebrook weighed in at 201 pounds.  (*Id.*, PageID.525.)

On May 3, 2019, Middlebrook was seen by a nurse after he began refusing his blood pressure medication.  (*Id.*, PageID.534.)  During that appointment, Middlebrook reported that his abdominal issues had resolved after he discontinued his soy diet.  (*Id.*, PageID.536.)  He indicated that he did not want to continue on the blood pressure medication despite his hypertension.[3]  (*Id.*)  Middlebrook weighed in at 208 pounds.  (*Id.*, PageID.535.) During an annual nurse visit on May 6, 2019, Middlebrook reported that he had no health concerns.  Middlebrook denied experiencing recurrent abdominal pain, or black or bloody stool.

 On July 18, 2020, Middlebrook kited health care and asked that he be placed on a mechanical soft diet,[4] as he was having difficulties chewing.  (ECF No. 59-10, PageID.562, 565.)  Middlebrook asked whether he would still receive his kosher food, as he did not want to give up his vegan meals.  (*Id.*)  Health care referred Middlebrook to Defendant Wellman, who informed Middlebrook that he would continue to receive religious meals on the mechanical soft diet, and told Middlebrook that she "would be

---

[3]    When health care scheduled serial blood-pressure checks in response to Middlebrook discontinuing the use of his blood pressure medication, Middlebrook asked the health care staff to "step harassing [him] by putting [him] down for a callout to have [his] high blood pressure checked."  (ECF No. 59-10, PageID.556.)  Middlebrook stated that he understood it was causing him to suffer "every morning and every night" but stated that it was his choice.

[4]    The MDOC's mechanical soft diet is "designed for prisoners who cannot tolerate the consistency of a regular diet, but do not require pureed foods."  (ECF No. 59-13, PageID.684 (MDOC Diet Manual).)  The diet includes "whole, very soft foods, such as cooked vegetables, canned or soft fruits, breads and grain products and soft desserts," as well as meats that are "ground to pea size consistency."  (*Id.*)

happy to order [his] mechanical soft diet once [she] heard back from [Middlebrook] confirming that [he] wished to be started on it." (*Id.*, PageID.567.)

On August 14, 2019, Middlebrook met with a nurse after asking to be placed back on his blood pressure medication. (ECF No. 59-11, PageID.588.) During that visit, Middlebrook denied experiencing nausea, abdominal pain, change in appetite, or change in bowel habits. (*Id.*, PageID.587-588.) The nurse noted that Middlebrook was "well-nourished" and was not experiencing any distress. (*Id.*, PageID.587.) Middlebrook weighed in at 198 pounds. (*Id.*, PageID.590.)

However, on August 21, 2019, Middlebrook kited health care expressing that he was experiencing stomachaches. (*Id.*, PageID.593.) He stated that he wanted to be seen about the food he was eating. (*Id.*) When he was seen by a nurse on August 23, 2019, Middlebrook reported experiencing an upset stomach and diarrhea from his religious diet. (*Id.*, PageID.595.) The nurse told Middlebrook to increase his fluid intake, noting that Middlebrook had already contacted the dietician. (*Id.*, PageID.594.)

Middlebrook kited health care again on August 27, 2019, asking what he should do about eating soy since he was continuing to have problems. (*Id.*, PageID.599.) Health care forwarded the kite to Defendant Wellman, who responded by stating: "Diet modifications are not made to accommodate individual food intolerances or preferences. No changes will be made to the religious menu for soy intolerance." (*Id.*, PageID.600.)

On September 5, 2019, Middlebrook was seen by a non-Defendant NP about his gastrointestinal issues.  (*Id.*, PageID.604.)  That NP noted that Middlebrook appeared well-nourished and recorded his weight at 198 pounds.  The NP ultimately prescribed Middlebrook antacids, noting that she suspected the issues were tied to gastroesophageal reflux disease (GERD), which Middlebrook had been treated for in the past.  The NP scheduled a follow-up appointment for November 5, 2019.  (*Id.*)

Middlebrook kited health care again on September 11, 2019, complaining that the antacids were not helping his stomach issues.  (*Id.*, PageID.608.)  He was seen by a registered nurse the next day.  (*Id.*, PageID.609.)  During that appointment, Middlebrook expressed that any time he consumed soy, he began having diarrhea. (*Id.*, PageID.611.)  He stated that the facility needed to give him a substitute for the soy, and that he would not touch anything with soy.  (*Id.*)

On September 19, 2019, Defendant Lewis met with Middlebrook and explained that religious diets are not modified to accommodate individual food intolerances. (*Id.*, PageID.614.)  Lewis also explained that the religious diet is fairly high in fiber, and that it is not unusual for people to experience bloating, gas, or related symptoms until their body gets used to the diet.  (*Id.*)  Lewis then prescribed Middlebrook Simethicone to help alleviate his gas and bloating.  (*Id.*, PageID.615.)

Middlebrook kited health care again regarding his issues with soy on October 23, 2019.  (ECF No. 59-12, PageID.625.)  He informed health care that he had not consumed soy since September 10, 2019 and was effectively starving himself.  He also cited a portion of MDOC policy stating that religious diets may be modified to provide

for therapeutic diets. (*Id.*) Defendant Wellman responded, explaining that modifications were made based on medical needs, not individual food intolerances, and that Middlebrook did not have a medical need for a modification. (*Id.*)

On November 10, 2019, Middlebrook kited health care again, this time requesting that his religious diet be modified based on medical need. (*Id.*, PageID.629.) Middlebrook asserted that he was having an "allergic reaction" to soy. A registered nurse responded, stating that Middlebrook's complaints were not "health care issue[s]" and that he should refer to Wellman's October 23, 2019 response to his kite, and to the Chaplain. Despite that response, Middlebrook submitted a nearly identical kite on November 13, 2019. (*Id.*, PageID.634.) When a nurse visited Middlebrook on November 15, 2019, Middlebrook denied having any symptoms related to his alleged soy allergy, and told the nurse there was no reason for a visit unless she could offer him a soy-substitute. (*Id.*, PageID.635.) During an unrelated health care visit on November 22, 2019, Defendant Lewis noted that Middlebrook was well-nourished, with Middlebrook weighing in at 187 pounds. (*Id.*, PageID.641, 644.) Middlebrook informed Lewis that he was not experiencing any bloating or gas and had not used the Simethicone in months. (*Id.*, PageID.645.) Defendant Lewis therefore discontinued Middlebrook's Simethicone prescription. (*Id.*)

In addition to medical records from the relevant time frame, Defendants provided the Court with a Lab Report from April of 2022.[5]  The pertinent portion of this Report is shown below.

| SOYBEAN (f14) ALLERGEN {SOYB} | | 04/08/2022 12:41 | 04/09/2022 19:54 |
|---|---|---|---|
| SOYBEAN | <0.10 (N) | kU/L | |
| SOYBEAN CLASS | 0 (N) | | |
| RAST INTERPRETATION | SEE RESULT COMMENTS BELOW | | |

| Specific IGE Class | kU/L | Level of Allergen Specific IGE Antibody |
|---|---|---|
| ----- | --------- | -------------------- |
| 0 | <0.10 | Absent/Undetectable |
| 0/1 | 0.10-0.34 | Very Low Level |
| 1 | 0.35-0.69 | Low Level |

(ECF No. 59-17, PageID.811.)

## IV.    Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

---

[5]    In a letter to the Court dated June 21, 2022, Middlebrook complains that he was never informed that health care would be conducting an allergy test, and that he only gave blood for his annual screening related to his high blood pressure.  (ECF No. 62, PageID.821.)  Middlebrook contends that the tests are irrelevant as his claims pertain to Defendants' actions in 2019.  (*Id.*, PageID.821,823.)

251-52 (1986)).  The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## V.    Deliberate Indifference

Middlebrook first contends that Defendants were deliberately indifferent to his serious medical needs, namely his sensitivity to soy, when they refused to alter his religious diet to provide him with a soy-alternative.   Defendants contend that Middlebrook has not established that he had a sufficiently serious medical need, or that they acted with deliberate indifference to that need.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes.  U.S. Const. amend. VIII.  It obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976).  The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner.  *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).  A claim for the deprivation of adequate medical care has an objective and a subjective component.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious.  *Id.*  In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.  *Id.*

12

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).  If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *Rouster v. Saginaw Cty.*, 749 F.3d 437, 448 (6th Cir. 2014); *Perez v. Oakland Cty.*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998).

To succeed on a claim of deliberate indifference, a prisoner who has received medical attention "must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell*, 553 F. App'x at 605 (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)).  And the prisoner must place medical evidence into the record verifying the detrimental effect of the inadequate treatment. *See Napier v. Madison Cty.*, 238 F.3d 739, 742 (6th Cir. 2001) (establishing that a prisoner must submit verifying medical evidence to support a deliberate indifference claim based on treatment delay); *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890 (6th Cir. 2004) (reiterating that a prisoner must submit verifying medical evidence to support a deliberate indifference claim based on inadequate treatment).

The subjective component of a deliberate indifference claim requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer*, 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.*; *see also Estelle*, 429 U.S. at 105-06 ([A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. . . . Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.")

Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. Differences in judgment between inmate and prison medical personnel regarding the appropriate medical diagnosis or treatment are not enough to state a deliberate indifference claim. *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996). This is so even if misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The subjective component was recently summarized in *Rhinehart v. Scutt*, 894 F.3d 721 (6th Cir. 2018). There, the court of appeals stated the following:

A doctor's errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference. Instead, the plaintiff must show that each defendant acted with a mental state "equivalent to criminal recklessness." This showing requires proof that each defendant "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk" by failing to take reasonable measures to abate it.

A plaintiff may rely on circumstantial evidence to prove subjective recklessness: A jury is entitled to "conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." And if a risk is well-documented and circumstances suggest that the official has been exposed to information so that he must have known of the risk, the evidence is sufficient for a jury to find that the official had knowledge.

But the plaintiff also must present enough evidence from which a jury could conclude that each defendant "so recklessly ignored the risk that he was deliberately indifferent to it." A doctor is not liable under the Eighth Amendment if he or she provides reasonable treatment, even if the outcome of the treatment is insufficient or even harmful. A doctor, after all, is bound by the Hippocratic Oath, not applicable to the jailor, and the physician's job is to treat illness, not punish the prisoner. Accordingly, when a claimant challenges the adequacy of an inmate's treatment, "this Court is deferential to the judgments of medical professionals." That is not to say that a doctor is immune from a deliberate-indifference claim simply because he provided "some treatment for the inmates' medical needs." But there is a high bar that a plaintiff must clear to prove an Eighth Amendment medical-needs claim: The doctor must have "consciously expos[ed] the patient to an excessive risk of serious harm."

*Id.* 738–39 (6th Cir. 2018) (internal citations omitted).

Middlebrook avers that his soy allergy[6] or intolerance[7] constituted a sufficiently serious medical need. Courts have found that a food allergy constitutes a sufficiently serious medical need when: (1) the allergy poses a "'sufficiently serious' injury or medical consequence," or (2) a prisoner's allergy prevents them from receiving nutritionally adequate food. *Vartinelli v. Aramark Corr. Servs., LLC*, No. 18-cv-10964, 2019 WL 1402653, at *6-7 (E.D. Mich. Mar. 28, 2019) (collecting cases), *aff'd*, 796 F. App'x 867 (6th Cir. 2019).

For example, in *Williams v. Horvey*, the court found that the plaintiff's food allergies constituted serious medical needs where they caused him to sweat, experience hot flashes, and vomit, in addition to causing his throat to swell. No. 14-cv-1289-JPG, 2014 WL 6657703, at *1, 3 (S.D. Ill. Nov. 24, 2014). But in *Bailey v. Aramark Corp.*, the court determined that that the plaintiff's alleged allergy did not satisfy the objective component of his deliberate indifference claim where it merely caused him to develop a rash or cysts. No. cv 16-343, 2017 WL 3841687, at *4 (E.D. Ky. Sept. 1, 2017); *see also Kensu v. Rapelje*, No. 12-11877, 2015 WL 5161629, at *4 (E.D. Mich. Sept. 1, 2015) (finding that the plaintiff did not allege a sufficiently

---

[6]    According to the MDOC's diet manual, a food allergy, otherwise known as food hypersensitivity, is an adverse food reaction due to an abnormal immune response to the proteins in foods. (ECF No. 59-3, PageID.399.)

[7]    According to the MDOC's diet manual, a food intolerance does not involve an immune response, and generally does not require therapeutic intervention. (*Id.*) Instead, a prisoner "may simply avoid the food he knows to cause him distress." The guide recommends therapeutic intervention only when avoiding the relevant food "compromises the prisoner's nutritional status." (*Id.*)

serious medical need where he claimed to have a gluten or dairy intolerance that caused him constipation and an increase in phlegm production).

Similarly, in *Escalante v. Huffman*, the court determined that the plaintiff stated a deliberate indifference claim where his food allergy caused him to lose thirty-four pounds over the course of a year, and to experience dizzy spells.  No. 7:10cv00211, 2011 WL 3107751, at *9 (W.D. Va. July 26, 2011), *R&R adopted*, No. 7:10cv00211, 2011 WL 3584992 (W.D. Va. Aug. 15, 2011).  But in *Kemp v. Drago*, the Court found that a seventeen-pound weight-loss was not medically significant where the plaintiff was "never malnourished."  No. CA 1:12-1481-JFA-SVH, 2013 WL 4874972, at *9 (D.S.C. Sept. 11, 2013), *aff'd*, 558 F. App'x 328 (4th Cir. 2014).

Even assuming that Middlebrook had a soy intolerance,[8]  the undersigned finds that Middlebrook has failed to create a genuine issue of material fact as to whether that intolerance constituted a serious medical need.  Middlebrook claims that he experienced "dizziness, cramps, headaches, nausea, diarrhea, and a loss of appetite" whenever he consumed soy.  (ECF No. 1, PageID.4.)  He also claims that he was "deprived . . . of the nutrition[] that he was supposed to receive off of his trays." (ECF No. 67, PageID.855.)

As an initial matter, courts are reluctant to find that occasional gastrointestinal symptoms alone may constitute a sufficiently serious medical need. *Gayton v. McCoy*, 593 F.3d 610, 621 (7th Cir. 2010) ("Vomiting, in and of itself, is not

---

[8]     Middlebrook's lab work establishes that he does not have a soy allergy.  (ECF No. 59-17, PageID.811.)

an uncommon result of being mildly ill, and, absent other circumstances (e.g., vomiting continuously for a long period of time, having blood in one's vomit, or the like), does not amount to an objectively serious medical condition."); *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (finding that the plaintiff failed to produce sufficient evidence that his alleged stomach disorders constituted serious medical needs); *Smith v. Hepp*, No. 18-CV-669-JDP, 2022 WL 1001183 (W.D. Wis. Apr. 4, 2022) ("Stomach distress often is not serious enough to support an Eighth Amendment claim" (citing *Riley El v. Godinez*, No. 13-c-5768, 2016 WL 4505038, at *11 (N.D. Ill. Aug. 29, 2016))). Accordingly, courts have rejected deliberate indifference claims based on food intolerances marked by simple gastrointestinal distress. *Brady v. Wexford Health Sources, Inc.*, No. 3:17-CV-883-MAB, 2021 WL 4262430 (S.D. Ill. Sept. 20, 2021) (finding no evidence that a plaintiff's "severe gas and constipation," which the plaintiff believed to be a result of consuming soy, constituted a serious medical need); *Ybarra v. Meador*, No. 9:09cv213, 2012 WL 12986185, at *9 (E.D. Tex. Jan. 12, 2012) (finding that the plaintiff had not provided sufficient evidence of a serious medical need where his medical records demonstrated that he had a food intolerance, not a food allergy), *R&R adopted*, No. 9:09cv213, 2012 WL 12986183 (E.D. Tex. June 5, 2012). Furthermore, Middlebrook's allegation that he was receiving inadequate nutrition is contradicted by his medical records.

On April 16, 2019, Middlebrook weighed 201 pounds. (ECF No. 59-9, PageID.525.) On November 22, 2019, Middlebrook weighed 187 pounds. (*Id.*, PageID.641.) Middlebrook is six feet and two inches tall. (*Id.*, PageID.525.)

18

According to the Centers for Disease Control and Prevention, the BMI for an adult who is six feet and two inches tall and weighs 201 pounds is 25.8, which is categorized as overweight.  *Adult BMI Calculator*, Centers for Disease Control and Prevention, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator /bmi_calculator.html (last updated September 2, 2022).  The BMI for an adult who is six feet and two inches tall and weighs 187 pounds is 24, which is categorized as healthy.  *Id.*  Moreover, AMF health care providers repeatedly noted that Middlebrook was well-nourished during the relevant time frame.  (*Id.*, PageID.587, 604, 644.)  Thus, in the opinion of the undersigned, no reasonable juror could determine that Middlebrook's soy intolerance constituted a sufficiently serious medical need based on the record before the Court.

But even if Middlebrook had established that his soy intolerance constituted a serious medical need, Middlebrook received medical attention for his intolerance. Middlebrook's medical records reflect that when Middlebrook first complained of his symptoms to a non-defendant nurse on April 16, 2019, the nurse recommended an increase in fluids, and to kite if his symptoms persisted or worsened.[9]  (ECF No. 59-9, PageID.526.)  Middlebrook did not complain again for four months.  When he kited about his gastrointestinal issues again on August 21, 2019, the nurse again recommended that he increase his fluid intake.  (ECF No. 59-11, PageID.594.)  A few weeks later, on September 5, 2019, a non-defendant NP prescribed Middlebrook

---

[9]    Even accepting Middlebrook's allegation that this appointment never occurred, the undersigned's analysis is the same.

antacids after he continued complaining of gastrointestinal issues.  (*Id.*, PageID.604.)
When Middlebrook met with Defendant Lewis on September 19, 2019, Lewis
explained that the religious diet was high in fiber, and that his body likely needed to
get used to the increased fiber intake.  (*Id.*, PageID.614.)  Lewis also prescribed
Middlebrook with medication to ease his gastrointestinal symptoms.  (*Id.*,
PageID.615.)  But when Middlebrook kited healthcare regarding his gastrointestinal
symptoms in November of 2019, he revealed that he had not taken the medication "in
months."  (ECF No. 59-12, PageID.645.)

In addition to the attention Middlebrook received from health care, Dietician
Wellman independently considered whether a soy-free diet was indicated.  (ECF No.
59-6, PageID.502.)    Wellman says that she reviewed Middlebrook's dietary
complaints, medical records, and store purchase history.  According to Wellman, she
"did not see any indication that Mr. Middlebrook was getting inadequate medical
treatment or suffering any significant medical issues due to consuming soy."  (*Id.*)
Wellman also noted that prior to requesting religious meals, Middlebrook was on the
standard menu, which "includes various forms of soy."  Yet Middlebrook did not
complain about gastrointestinal symptoms until he started on the vegan religious
meal.  (*Id.*)  For these reasons, Dietician Wellman did not believe that Middlebrook
required a medical diet modification.

Ultimately, Middlebrook simply disagrees with the steps Defendants took with
respect to his alleged soy intolerance.  Middlebrook believes the correct course of
action was to modify his diet; per Middlebrook's medical records, Defendants did not

believe that a diet modification was medically necessary.  Instead, NP Lewis believed that the appropriate course of action was the medication that Middlebrook neglected to take.  When a prisoner's allegations can be reduced to a disagreement between the prisoner and provider's course of treatment, those allegations do not state a claim of deliberate indifference.  *Sanderfer*, 62 F.3d at 154-55; *Ward*, 1996 WL 627724, at *1.  Accordingly, the undersigned recommends that the Court grant Defendants' motions for summary judgment as to Middlebrook's deliberate indifference claim.[10]

## VI.    RLUIPA

The undersigned now turns to Middlebrook's claim against Defendants under the Religious Land Use and Institutionalized Persons Act.  Here, Middlebrook asserts that Defendants' refusal to alter his religious diet to include a kosher soy alternative substantially burdened his religious beliefs.[11]

---

[10]    Though the undersigned finds that Middlebrook's deliberate indifference claim fails, the undersigned is sympathetic to some of Middlebrook's frustrations surrounding his dietary requests.  Defendant Wellman says that only medical providers are authorized to order therapeutic diets such as soy-free diets.  (ECF No. 59-6, PageID.499 (Wellman's Affidavit).)  Yet on at least one occasion when Middlebrook complained of what he believed to be a soy allergy, health care responded that it was "not a health care issue."  (ECF No. 59-12, PageID.634.)  But ultimately, it bears repeating: Middlebrook is not allergic to soy, and even assuming soy caused him gastrointestinal distress, Middlebrook received treatment for that distress.

[11]    The undersigned acknowledges, and ultimately rejects, Defendant Wellman's construction of Middlebrook's claim as "unrelated to his claims regarding soy" and "strictly [pertaining to] not being served meat and dairy as a part of his diet." (ECF No. 59, PageID.319.)  Middlebrook's complaint and indeed all of Middlebrook's pleadings make clear that his RLUIPA claim is based on Defendants' refusal to accommodate his alleged soy allergy or intolerance.  (*See* ECF No. 1, PageID.10; ECF No. 67, PageID.858-859.)  He complains that he does not receive meat or dairy despite the fact that the soy in his diet makes him ill.  *Id.*

21

In relevant part, the RLUIPA prohibits any government from imposing a "substantial burden on the religious exercise" of a prisoner, unless such burden constitutes the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. § 2000cc-1(a). The term "religious exercise" "includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7). While this definition of religious exercise is broad, it does require that the plaintiff's religious beliefs be "sincerely held." *Episcopal Student Found. v. City of Ann Arbor*, 341 F. Supp. 2d 691, 700 (E.D. Mich. 2004) (citation omitted); *Lovelace v. Lee*, 472 F.3d 174, 187 n.2 (4th Cir. 2006) (citations omitted). However, prison officials may not inquire into whether a particular belief or practice is "central" to a prisoner's religion. *See Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005) (recognizing that "the truth of a belief is not open to question, rather the question is whether the objector's beliefs are truly held"); *Colvin v. Caruso*, 605 F.3d 282, 298 (6th Cir. 2010) (holding that the "touchstone for determining whether a religious belief is entitled to free-exercise protection is an assessment of 'whether the beliefs professed . . . are sincerely held,' not whether 'the belief is accurate or logical.'").

While the phrase "substantial burden" is not defined in the RLUIPA, courts have concluded that a burden is substantial when it forces an individual to choose between the tenets of his religion and foregoing governmental benefits, or places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729,

733-34 (6th Cir. 2007) (citations omitted); *Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005) (recognizing that RLUIPA's institutionalized persons provision was intended to alleviate only "exceptional" burdens on religious exercise).  Similarly, if a policy requires a petitioner to "engage in conduct that seriously violates [his] religious beliefs" or face disciplinary action, then the burden is substantial.  *Hobbs*, 574 U.S. at 361 (quoting *Hobby Lobby*, 573 U.S. at 720).  Moreover, the fact that the petitioner can engage in other forms of religious exercise is not relevant to whether the burden is substantial.  *Id.*

In his complaint, Middlebrook provides that "[a]ccepting [his] allegations as true regarding his soy allergy/intolerance, he must choose one of three options: (1) abandon his religious diet practices, (2) endure gastrointestinal discomfort including diarrhea, vomiting, and stomach pain, or (3) have less than adequate nutrition from his religious diet."  (ECF No. 1, PageID.10.)  Though not cited by Middlebrook, this statement comes directly from this Court's screening opinion in *Rains v. Washington*, No. 2:20-cv-32, 2020 WL 1815839, at *8 (W.D. Mich. Apr. 10, 2020).  There, the Court determined that placing the plaintiff in the position to choose between those three options appeared to be "precisely the type of pressure that substantially burdens the free exercise of his religious practice."  *Id.*  But Middlebrook's medical records, in addition to his own deposition testimony, establish that Middlebrook was not placed in that position.

According to Dietician Wellman, and to the MDOC's diet manual, the vegan menu includes a variety of foods.  (ECF No. 59-6, PageID.499 (Wellman's Affidavit).)

Sometimes prisoners on the vegan menu are served soy, but sometimes they are served bean spreads, bean burgers, peanut butter, oatmeal patties, or other foods instead.  Wellman says that even when a vegan meal includes soy, there are soy-free foods available such as potatoes, rice or noodles, vegetables, breads, fruits, and desserts.  (*Id.*)

And although Middlebrook claims that he was forced to choose between gastrointestinal distress, adhering to his religious tenets, and obtaining adequate nutrition, Middlebrook testified as follows during his April 20, 2022 deposition:

18  Q    Mr. Middlebrook, I just wanted to clarify.  So you say you
19        quit eating soy September 10th of 2019; right?
20  **A   Yes.  Yes, ma'am.**
21  Q    And you've been on the kosher or the vegan diet ever since;
22        right?
23  **A   Yes.**
24  Q    Okay.
25  **A   Yes.**
1   Q    So you've been able to basically find enough food on that menu
2        that is not soy to basically sustain you to keep you going.
3        Either that or by trading or getting commissary or, like you
4        said, kind of maybe trading or whatever you do with other
5        prisoners for other food?
6   **A    Yes.**

(ECF No. 59-7, PageID.513.)

Furthermore, as noted above, Middlebrook's medical records show that he maintained adequate nutrition during the relevant timeframe.  (ECF No. 59-9, PageID.587, 604, 641, 644.)

Accordingly, Middlebrook cannot establish that Defendants substantially burdened his religious exercise.  The record reflects that Middlebrook's vegan religious diet adhered to his religious beliefs,[12] and that Defendants did not put Middlebrook in the position to abandon that diet or else receiving inadequate nutrition.  In other words, Middlebrook was not presented "an illusory or Hobson's choice where the only realistically possible course of action available . . . trenches on sincere religious exercise."  *Yellowbear v. Lampert*, 741 F.3d 48 (10th Cir. 2014).  Middlebrook had the option, and seemingly exercised the option, of avoiding foods that caused him gastrointestinal distress while remaining on the vegan religious meal plan.  Accordingly, the undersigned recommends that the Court dismiss Middlebrook's RLUIPA claim against Defendants.[13]

---

[12]    It is worth noting that even had Middlebrook established that he was allergic to soy, it is unclear whether a vegan diet would have burdened his sincerely held religious beliefs.  During his April 20, 2022 deposition, Middlebrook testified that "at the end of the day" he "wanted to be on the [religious] tray because [he] wanted to be healthy."  (ECF No. 59-7, PageID.509.)  When asked whether it was "fair to say that [he] started practicing Judaism so that [he] could eat a kosher diet," Middlebrook responded "yes."  (*Id.*)

[13]    The undersigned alternatively notes that the RLUIPA does not create a cause of action against an individual in their individual capacity.  *Dykes v. Corizon, Inc.,* No. 2:22-cv-113, 2022 WL 2900892, at *8 (W.D. Mich. July 22, 2022) (first citing *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 331 (5th Cir. 2009), *aff'd on other grounds*, *Sossamon v. Texas*, 563 U.S. 277 (2011); then citing *Grayson v. Schuler*, 666 F.3d 450, 451 (7th Cir. 2012); and then citing *Washington v. Gonyea*, 731 F.3d 143, 145 (2d Cir. 2013)).  As such, even if the Court finds that there are genuine issues of material fact bearing on Middlebrook's RLUIPA claims, the Court should dismiss

25

## VII.   Qualified and Sovereign Immunity

In addition to arguing that she did not violate Middlebrook's rights under the Eighth Amendment or the RLUIPA, Defendant Wellman asserts that she is entitled to qualified immunity in her individual capacity and sovereign immunity in her official capacity.  (ECF No. 59, PageID.320-322.)

Wellman's claim for qualified immunity is largely redundant.  After initially arguing that she is entitled to judgment because she did not violate Middlebrook's Eighth Amendment or RLUIPA rights, she argues that she is entitled to qualified immunity because she did not violate Middlebrook's Eighth Amendment or RLUIPA rights.  In any event, the undersigned agrees; because there are no genuine issues of material fact and the undersigned finds that Wellman did not violate Middlebrook's clearly established Eighth Amendment or RLUIPA rights, Wellman is entitled to qualified immunity.  *See Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008) ("Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))).

---

Middlebrook's RLUIPA claims against Wellman and Lewis in their individual capacities.

Wellman's claim for sovereign immunity is different.  She argues that she is entitled to sovereign immunity in her official capacity as an officer of the state, regardless of the merits of Middlebrook's claims.

A lawsuit against a state official for monetary damages is treated as a lawsuit against the State.  *Brandon v. Holt*, 469 U.S. 464, 471 (1985).  The states and their departments are immune under the Eleventh Amendment from suit in the federal courts unless the state has waived immunity or Congress has expressly abrogated Eleventh Amendment immunity by statute.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–101 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *O'Hara v. Wigginton*, 24 F.3d 823, 826 (6th Cir. 1993).  Section 1983 did not expressly abrogate Eleventh Amendment immunity, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), nor did the RLUIPA, *Sossamon v. Texas*, 563 U.S. 277, 288 (2011), and the State of Michigan has not consented to civil rights suits, *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986), or RLUIPA suits in federal court, *Cardinal v. Metrish*, 564 F.3d 794, 801 (6th Cir. 2009).  As such, Middlebrook's claims against Defendant Wellman in her official capacity for monetary damages are properly dismissed in accordance with Eleventh Amendment.

But Middlebrook also seeks prospective relief; state actors are not entitled to sovereign immunity on claims for prospective relief.  *Doe v. Wigginton*, 21 F.3d 733 (6th Cir. 1994) (citing *Ex parte Young*, 209 U.S. 123, 159-60 (1908)) (explaining that official-capacity claims for prospective relief are "deemed to be against only the nominal defendant officers" and are therefore not barred by the Eleventh

Amendment); *see also Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 904 (6th Cir. 2014) (explaining that *Ex parte Young* and its progeny "allow federal courts to enjoin state officers in their official capacity from prospectively violating a federal statute or the Constitution").  As such, Wellman is only entitled to sovereign immunity on Middlebrook's claims for monetary damages against her in her official capacity.

## VIII.  Recommendation

The undersigned respectfully recommends that the Court grant Defendants' motions for summary judgment.  Defendants have shown that there are no genuine issues of material fact, that Middlebrook did not have a sufficiently serious medical need, and that Defendants did not act with deliberate indifference to Middlebrook's needs.  Additionally, Defendants have shown that the vegan religious diet did not burden Middlebrook's sincere religious beliefs.  In sum, Defendants have met the Rule 56 standard with respect to Middlebrook's deliberate indifference and RLUIPA claims.

If the Court accepts this recommendation, this case will be dismissed.


Dated:  January 3, 2023                      /s/ *Maarten Vermaat*
                                             MAARTEN VERMAAT
                                             U. S. MAGISTRATE JUDGE

## <u>NOTICE TO PARTIES</u>

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C) Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).